# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or*<br>*identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF INFORMATION<br>ASSOCIATED WITH FOUR ACCOUNT(S) STORED AT PREMISES<br>CONTROLLED BY THREE PROVIDER(S) PURSUANT TO 18<br>U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C.<br>875(d) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   24-sc-335 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, A-2, and A-3, hereby incorporated by reference.

located in the _____Jurisdiction_____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, B-2, and B-3, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 875 | Extortion through Interstate Communicaitons |
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1030 | Computer Fraud (Unauthorized Access) |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under
  18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

DERECK FRANKLIN, SPECIAL AGENT
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:  02/14/2024
_____

City and state:  Washington, D.C.
_____

_____
*Judge's signature*

ZIA M. FARUQUI, UNITED STATES MAGISTRATE JUDGE
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or*<br>*identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF INFORMATION<br>ASSOCIATED WITH FOUR ACCOUNT(S) STORED AT<br>PREMISES CONTROLLED BY THREE PROVIDER(S)<br>PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION<br>OF VIOLATION OF 18 U.S.C. 875(d) | )<br>)<br>)<br>)  Case No.   24-sc-335<br>)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of ____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, A-2, and A-3, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1, B-2, and B-3, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before  February 28, 2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     February 14, 2024_____          _____
                                                                                                                    *Judge's signature*

City and state:          Washington, D.C._____          ZIA M. FARUQI, UNITED STATES MAGISTRATE JUDGE
                                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: 24-sc-335 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A-1**
**Property to Be Searched**

This warrant applies to information which is associated with the Apple, account(s) identified by telephone number 919-748-9707 and which is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company that is headquartered at / accepts service of legal process at One Apple Park Way, Cupertino, CA.

**ATTACHMENT B-1**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.**     Information to be disclosed by Apple, Inc. ("PROVIDER") to facilitate execution of the warrant

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A-1:

a.     For the time period from December 1, 2023 to January 24, 2024: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services and iCloud services), including but not limited to incoming, outgoing, and draft emails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of emails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[1]

---

[1] Here, PROVIDER's other services include iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information,

b.      For the time period December 1, 2023 to January 24, 2024: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period December 1, 2023 to January 24, 2024: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period December 1, 2023 to January 24, 2024: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); Apple Pay (which allows users to store credit, debit, or other payment card information, make purchases at Apple Store locations or through Apple.com, and make contactless payments at accepting merchants); and App Store and iTunes Store (which allow users to purchase and download digital content, e.g., applications).

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN") and Google Cloud Messaging ("GCM"));

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period December 1, 2023 to January 24, 2024: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to the following:

Special Agent Dereck Franklin

FBI

Washington Field Office

Squad CY05

601 4th Street NW

Washington, DC 20535

**II.**          **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1030, 18 U.S.C. § 875, and 18 U.S.C. § 1343 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a.     Information that constitutes evidence of the identification or location of the user(s) of the Account;

b.     Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.     Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.     Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

e.     Information that constitutes evidence concerning the theft of, or unlawful possession of, records, files and documents containing personally identifiable information (PII);

f.      Information relating to the receipt and disposition of criminal proceeds derived from the offenses, the creation and maintenance of financial accounts (including virtual currency accounts), financial transfers and transactions, the possession of monetary instruments, and the disbursement of funds;

g.      Information that constitutes evidence of unauthorized access to protected computers, including unauthorized communications to and from said computers, or to and from command and control infrastructure associated with malware and/or computer intrusions;

h.      Information concerning the theft of, or unlawful possession of, login credentials and protected PII;

i.      Information that constitutes evidence concerning how and when the TARGET ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the TARGET ACCOUNT user;

j.      Information about other online accounts used by the user(s) or subscriber(s) of the TARGET ACCOUNT.

k.      Information that constitutes evidence concerning preparatory steps taken in furtherance of the TARGET OFFENSES.

**III.**            **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**ATTACHMENT A-2**
**Property to Be Searched**

This warrant applies to information which is associated with the Google, account(s) identified by ccameron332@gmail.com and ccameron3321@gmail.com and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that is headquartered at / accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

**ATTACHMENT B-2**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Google, LLC ("PROVIDER") to facilitate execution
      of the warrant**

To the extent that the information described in Attachment A-2 is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A-2:

a.    For the time period December 1, 2023 to January 24, 2024: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as email services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services, Google Drive), including but not limited to incoming,

outgoing, and draft emails, messages, calls, chats, and other electronic communications;

attachments to communications (including native files); source and destination addresses and

header or routing information for each communication (including originating IP addresses of

emails); the date, size, and length of each communication; and any user or device identifiers linked

to each communication (including cookies);[1]

---

[1] Here, PROVIDER's other services include electronic communication services such as Gmail
(electronic mail), Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant
messaging and video chats, previously called Hangouts), Google+ (social networking), Google
Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web
browsing and search tools such as Google Search (internet searches), Web History (bookmarks
and recorded browsing history), and Google Chrome (web browser); online productivity tools such

b.      For the time period December 1, 2023 to January 24, 2024: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period December 1, 2023 to January 24, 2024: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period December 1, 2023 to January 24, 2024: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications).

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN") and Google Cloud Messaging ("GCM"));

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period December 1, 2023 to January 24, 2024: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to the following:

Special Agent Dereck Franklin

FBI

Washington Field Office

Squad CY05

601 4th Street NW

Washington, DC 20535

**II.**          **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1030, 18 U.S.C. § 875, and 18 U.S.C. § 1343  as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a.      Information that constitutes evidence of the identification or location of the user(s) of the Account;

b.      Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.      Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.      Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

e.      Information that constitutes evidence concerning the theft of, or unlawful possession of, records, files and documents containing personally identifiable information (PII);

f.     Information relating to the receipt and disposition of criminal proceeds derived from the offenses, the creation and maintenance of financial accounts (including virtual currency accounts), financial transfers and transactions, the possession of monetary instruments, and the disbursement of funds;

g.     Information that constitutes evidence of unauthorized access to protected computers, including unauthorized communications to and from said computers, or to and from command and control infrastructure associated with malware and/or computer intrusions;

h.     Information concerning the theft of, or unlawful possession of, login credentials and protected PII;

i.     Information that constitutes evidence concerning how and when the TARGET ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the TARGET ACCOUNT user;

j.     Information about other online accounts used by the user(s) or subscriber(s) of the TARGET ACCOUNT.

k.     Information that constitutes evidence concerning preparatory (e.g. staging of data) steps taken in furtherance of the TARGET OFFENSES.

**III.**          **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**ATTACHMENT A-3**
**Property to Be Searched**

This warrant applies to information which is associated with the DropBox account(s) identified by ccameron332@gmail.com and which is stored at premises owned, maintained, controlled, or operated by DropBox, Inc., a company that is headquartered at / accepts service of legal process at 1800 Owens St., Ste. 200 San Francisco, CA 94158

## ATTACHMENT B-3

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.**     Information to be disclosed by DropBox, Inc. ("PROVIDER") to facilitate execution of the warrant

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A-3:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such

device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN") and Google Cloud Messaging ("GCM"));

      c.     For the time period December 1, 2023 to January 24, 2024: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as, file sharing or storage services, photo sharing or storage services, remote computing services, or remote computing services including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, images, videos, notes, documents, profiles, device backups, and any other saved information);

      d.     For the time period December 1, 2023 to January 24, 2024: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

      e.     All records pertaining to communications between PROVIDER and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

      Special Agent Dereck Franklin

      FBI

      Washington Field Office

      Squad CY05

601 4th Street NW

Washington, DC 20535

**II.**                       **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1030, 18 U.S.C. § 875, and 18 U.S.C. § 1343 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

a.       Information that constitutes evidence of the identification or location of the user(s) of the Account;

b.       Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.       Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.       Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

e.       Information that constitutes evidence concerning the theft of, or unlawful possession of, records, files and documents containing personally identifiable information (PII);

f.      Information relating to the receipt and disposition of criminal proceeds derived from the offenses, the creation and maintenance of financial accounts (including virtual currency accounts), financial transfers and transactions, the possession of monetary instruments, and the disbursement of funds;

g.      Information that constitutes evidence of unauthorized access to protected computers, including unauthorized communications to and from said computers, or to and from command and control infrastructure associated with malware and/or computer intrusions;

h.      Information concerning the theft of, or unlawful possession of, login credentials and protected PII;

i.      Information that constitutes evidence concerning how and when the TARGET ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the TARGET ACCOUNT user;

j.      Information about other online accounts used by the user(s) or subscriber(s) of the TARGET ACCOUNT.

k.      Information that constitutes evidence concerning preparatory (e.g. staging of data) steps taken in furtherance of the TARGET OFFENSES.

**III.**          **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOUR ACCOUNT(S) STORED AT PREMISES CONTROLLED BY THREE PROVIDER(S) PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 875(d)** | **SC No.** 24-sc-335 |

*Reference:     USAO Ref. # 2024R00073 In re Loot; Subject Account(s): 919-748-9707, ccameron332@gmail.com, ccameron3321@gmail.com*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Dereck Franklin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the following three accounts (collectively, the TARGET ACCOUNTS):

| Accounts | Provider |
|---|---|
| Apple Account(s):     919-748-9707 | Apple Inc. |
| Gmail Account(s): ccameron332@gmail.com, ccameron3321@gmail.com | Google LLC |
| Dropbox Account: ccameron332@gmail.com | Dropbox, Inc. |

The information is stored at premises controlled by the providers, each of which is an electronic communications services provider and/or remote computing services provider (collectively "PROVIDERS"). The providers are headquartered at / accept service at:

| Provider | Address |
|---|---|
| Apple Inc. | One Apple Park Way, Cupertino, California |
| Google LLC | 1600 Amphitheatre Parkway, Mountain View, California |

| Provider | Address |
|---|---|
| DropBox, Inc. | 1800 Owens St., Ste. 200 San Francisco, CA 94158 |

2.      The information to be searched is described in the following paragraphs and in Attachments A-1 through A-3. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require each PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 through B-3. Upon receipt of the information described in Section I of Attachments B-1 through B-3, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 through B-3, using the procedures described in Section III of those attachments.

3.      I have been a Special Agent with the Federal Bureau of Investigation (FBI) since 2016. During that time, I have participated in investigations involving computer intrusion, to include spear phishing attacks, credential reuse, ransomware, and malware development and deployment schemes. I have conducted or participated in arrests, the execution of search warrants, surveillance, debriefings of informants, and reviews of forensic computer data. I am currently assigned to the FBI Washington Field Office ("WFO"), where I investigate crimes involving ransomware deployment, hacking services for hire and computer intrusion. Prior to my assignment to WFO, I was a computer scientist with the United States Secret Service, where I served as a technical advisor to various investigative programs in support of financially-motivated cyber intrusion investigations. I have also received training in cyber-crime investigation techniques, computer evidence identification, offensive and defensive cybercrime measures and analyzing and tracing digital currency. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 875(d), 18 U.S.C. § 1343, and 18 U.S.C. § 1030 (hereinafter "TARGET OFFENSES") have been committed by Cameron Curry (hereinafter "CURRY"). There is also probable cause to search the information described in Attachments A-1 through A-3 for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachments B-1 through B-3.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

7.     The investigation into CURRY began in or around January 2024, based on information provided to the FBI by Company 1 (hereinafter "VICTIM") a U.S.-based company headquartered in the District of Columbia. On December 14, 2023, the VICTIM notified the FBI of a potential cyber incident.  Specifically, the VICTIM told the FBI that unidentified individual(s), calling themselves "Loot" (hereinafter "SUBJECT"), sent anonymous email messages to the

VICTIM indicating SUBJECT had possession of sensitive financial records and personally identifiable information (PII) of VICTIM's employees. The email messages threatened to disclose the information if a payment wasn't made to the SUBJECT.

### *Email Threats*

8.      On December 11, 2023, certain employees of VICTIM received an email message with the title "LOOT DATA LEAK(DOCUSIGN AGREEMENT ATTACHED)" from email account lootsoftware@outlook.com (hereinafter "SUBJECT EMAIL ACCOUNT"). The email message contained the following:

"To whom it may concern,

I am the founder of a company called Loot. We have recently partnered with your company to implement salary transparency within your organization. As you roll out Salary Statements for 2024, we would like to share your organization's salaries with everyone in the company. Salary transparency is crucial as the cost of living rises. Loot and our partners aim to ensure that everyone is being paid accordingly, providing employees with the leverage they deserve while also adhering to federal government regulations on protected acts.

Please sign the documents sent through DocuSign, which is linked to this email. The pricing is firm and will not be negotiated. Late responses, no responses, or negotiations of the lump sum payment will result in the automatic publication of the site and distribution of files to your organization. Let's kick start salary transparency!

Attached, you will find an introduction, a DocuSign settlement that you will also get in another email to sign, the organization's sample email that will be sent to all of your employees if we do not come to an agreement, and proof that we have all your company information. Once the documentation is sent, we will then provide routing information. DocuSign passwords are your employee ID numbers. Once everything is signed and sent back, I will send you back my signature as well as proof of deletion of all company records which is also in the agreement.

Thanks,

Loot"

9.      The December 11, 2023 email message included five attachments: three PDF files and two image files. The PDF file names were "Loot_Introduction_12_12," "Org_Sample_Email_12_12," and "CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE.pdf." The image files attached to the email contained screenshot images from spreadsheets that appear to contain PII of employees of the VICTIM, to include, name, date of birth, home address, and compensation information, among others.

10.     The PDF file named "Loot_Introduction_12_12" appeared to be a message addressed to the General Counsel of the VICTIM. It contained a logo with the word "LOOT" and was dated "Dec 12, 2023". The message stated:

"To Whom It May Concern:

I am the founder of Loot, this email pertains to the matter mentioned above, and I formally request the preservation of all documents related to this issue in accordance with the Federal Rules of Civil Procedure, Rule 37. Further correspondence regarding this matter should be directed to my personal email at lootsoftware@outlook.com.

We have large file sizes of your encrypted data that contains your employee's salary information, merit increases, promotions, department budgets, all employee emails and more.

Loot is similar to platforms such as https://www.glassdoor.com/Salaries/index.htm and levels.fyi, allows for anonymous sharing of total compensation information based on job titles. Which are very similar to the tool I created and now own rights to as well as security packages that will allow your company data to stay safe and protected. You can find a list of Data Privacy recommendations attached in this email.

For legal matters, I propose utilizing DocuSign for handling documentation. I trust that an amicable resolution for both parties can be reached within the next three (3) business days. You can reach me via email at lootsoftware@outlook.com for all questions. Any form of negotiation or no response within the 3 days will opt you out of the agreement and we will send all employee information out to each employee in your org and they will see everyone salary creating a hostile work environment, retention issues or the company failing if you have to adjust half your org salaries right before merit increase come out."

11.     The PDF file named "CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE.pdf" contained the date "December 12, 2023" at the top. In a paragraph titled "2. Release and General Waiver", it stated "In consideration of the payment of $2,500,000 USD (Two Million Five Hundred Thousand), as detailed in Section 5 below, Loot hereby releases and forever discharges *[VICTIM]*, along with its officers, directors, employees, and agents, from any and all claims, liabilities, demands, actions, causes of action, costs, and expenses, whether at law or in equity, known or unknown, arising out of or in connection with the creation and distribution of Loot". In a paragraph titled "5. Lump Sum Payment", it stated "The Company agrees to make a lump sum payment of $2,500,000 to Loot".

12.     On December 13, 2023, an email message with the title "(URGENT)24 HOURS TO RESPOND! *[VICTIM]* DATA" was sent to certain employees of VICTIM. The message stated:

> "Hello,
>
> This is Loot, a company that enables employees to access full pay transparency within the organization. Currently, we maintain all financial records for the company and will disclose them if an agreement is not reached. Should you have any questions, please feel free to reach out before the deadline. We will send out salary emails to ensure that everyone is aware of their expected compensation. Additionally, we will provide instructions on how to address pay discrimination through mediation without the need for legal representation through the EEOC or start a class action suit for them. Please find attached screenshot of our website that we will post documents for a subscription price your employees will more than likely pay for to access lots of documents.
>
> Attached is your legal team's salary information only one person is getting paid a bonus when most people in the company who do high professional position do. Lets kick start salary transparency!
> Negotiations are on the table for the next 24 hours. Price is firm, contract details are negotiable.
>
> Thank you,
>
> Loot"

13.    On December 18, 2023 an email message with the title "NEW SEC LAW! REPORT BREACH OR WE WILL!" was sent to certain employees of VICTIM. The message stated:

> "Hello,
>
> On December 18th, 2023, a new SEC law is in effect. If you fail to comply with the law and not report a data breach, as mandated by the law, you will be anonymously reported to the SEC IMMEDIATELY. This information will now be public to your shareholders therefore negotiations are allowed for now since there will be damage to the company if we report and we would like to prevent that with an agreement. Please report or negotiate otherwise, this will be made public through the SEC IMMEDIATELY, impacting your stocks & company once we have someone anonymously report you to the SEC.
>
> New SEC law On December 18th, 2023 the Securities and Exchange Commission requires registrants to disclose on the new Item 1.05 of Form 8-K any cybersecurity incident they determine to be material and to describe the material aspects of the incident's nature, scope, and timing, as well as its material impact or reasonably likely material impact on the registrant.
>
> REPORT BREACH OR YOU WILL BE REPORTED ANONYMUSLY OR MAKE AN AGREEMENT SO YOUR STOCKS WON'T GET SHORTENED AND KEEP YOUR DATA CONFIDENTIAL!
>
> MAKE SURE BREACH IS DETAILED IF YOU REPORT TO SEC OR WE WILL LIST ALL THE DETAILS TO SEC IF NO AGREEMENT IS MET!"
>
> WE WILL ALSO ADD *[VICTIM]* INTO THIS SEC REPORTING IF AN AGREEMENT IS NOT MET!"

14.    On December 28, 2023, an email message with the title "EMPLOYEES WILL KNOW EVERYONE PAY!" sent to certain employees of the VICTIM. The message contained an embedded image of what appeared to be a spreadsheet containing employee names, job titles, and compensation information. The message stated:

> "As we have not received a response, we will commence the process of disseminating salary information starting January 1,2024 in phases to all employees and will report you to the SEC after for not reporting the breach. Initially, the first salary information will be sent via LinkedIn and email to each Vice President (VP) and Senior Vice President (SVP), along with your Senior and Principal members of the technical team first. Subsequently, in the following month, we will extend this process to Software Engineers it will not go out all at one time and continue gradually just in case you want to buy your data back if things start have a negative impact on the company.

If you wish to reclaim your data, we recommend doing so promptly at 2.5 million USD in order to save your company and stocks, as each subsequent month will incur a $100,000 USD increase. Discrepancies in your books are currently over 16 million USD, posing a potential risk for retention issues, a hostile work environment, resentment, and more.

Kindly be aware that we will provide each employee our contact information should they choose to pursue legal action or join a class-action lawsuit we will set up an EEOC interview for each employee who chooses to do so. We strongly advise employees to consider exploring new job opportunities and, especially for underpaid women, to participate in a class-action suit.

Thanks,

Loot"

The FBI inquired of the VICTIM about the authenticity of the data displayed in the images sent by the SUBJECT. The VICTIM affirmed the authenticity of the data and indicated it came from a file named 2023MeritRollup_Merit&Bonus.xlsx that was downloaded on December 5, 2023 to CURRY's corporate laptop provided by the VICTIM.

15.     As a result of the SUBJECT's emails, VICTIM has initiated cybersecurity incident response procedures. VICTIM is conducting a review of network security logs and other analyses of devices and infrastructure to determine how the SUBJECT accessed and exfiltrated the sensitive data. The investigation into the method and extent of a possible network security breach is ongoing.

16.     On January 9, 2014, the SUBJECT sent an email message and demanded a smaller payment to be sent to the Bitcoin (BTC) address "33Dh8QFYdYH6Dcfauwu2YR4neuyriaqfcF" (hereinafter the "33Dh wallet"). The message stated:

"We are pleased to come to an agreement and want you to know your data will not be going out any further once the below is met. 😊
We would like the payment to be sent through Bitcoin instead here is the Bitcoin address - 33Dh8QFYdYH6Dcfauwu2YR4neuyriaqfcF

The data will be deleted once a nice counter offer is paid. It should be no less than 1.5 million with maybe an additional 100k - 200k scraped off due to the 6 additional

people that went out. If not 3 people will be sent their manager negative comments with the manager CC in the email. $2,500 test payment should be made today January 9, 2024. And the Counter offer payment should be made within 7 - 10 business days starting January 9, 2024.

Once payment is sent, we will send conformation of all files being deleted through screen recordings and videos while also recording us flushing the flash drive away and handing over some serious business recommendation to protect your company I mean serious business recommendations since this is your 2nd breach within 1 year. We do not want this to happen again.

Thanks,

Loot"

17.     On January 9, 2024, the VICTIM informed the FBI that they submitted a payment to the SUBJECT in Bitcoin.  The total value of the payment at the time was approximately $2500.00   USD.   The   transaction   hash   of   the   payment   was "ccc45f2ed48b6d40f2c100360df67983af57d877c13d967a0b47e40981a271e8".

18.     Since December 11, 2023, the VICTIM has received over 60 email messages from SUBJECT EMAIL ACCOUNT.  Many of the messages contain deadlines for the VICTIM to respond or suffer the consequences of SUBJECT disclosing data. On January 22, 2024, SUBJECT sent an email message containing another deadline for payment by the VICTIM by 5PM on January 23, 2024.

### *Threat Actor Attribution*

19.     The investigative team received copies of the email messages and attachments sent by the SUBJECT.  The investigative team analyzed the metadata of the PDF file attachments named  "Loot_Introduction_12_12"  and  "CONFIDENTIAL  SETTLEMENT  AGREEMENT AND GENERAL RELEASE.pdf".  The investigative team observed that both files were created on "12/11/2023" by "Cameron Curry."

20.     The FBI determined, through investigative methods, that the 33Dh wallet is associated with the cryptocurrency exchange platform Coinbase. On January 16, 2024, the investigative team obtained legal process for the subscriber records associated with the 33Dh wallet.

21.     The subscriber records listed "Cameron Curry" as the owner of the 33Dh wallet serviced by Coinbase.  The account registrant information is:

Name: Cameron Curry
Email: ccameron332@gmail.com
Created: January 8, 2024 11:24am PST
Birthdate: 10/10/1998
Driver's License: 38385134
Phone Number: 919-748-9707

The phone number provided to Coinbase required verification by the account owner and was verified.  Additionally, the 33Dh wallet account was validated through a North Carolina driver's license to comply with the company's know-your-customer process. The Coinbase return contained three image files that contained pictures of the front side of a North Carolina driver's license. The picture on the driver license was of a black male with facial hair and short hair. The North Carolina driver's license displayed the following information:

DLN: 000038385134
DOB: 10/10/1998
EXP: 10/10/2027
Cameron Nicholas Curry
5805 Waterford Landing Ct Raleigh, NC 27610-6324

22.     The investigative team reviewed transaction records in the Coinbase return which revealed on January 9, 2024, the account received a payment of about 0.05338064 BTC or about $2478.8 US Dollars. The transaction hash was "ccc45f2ed48b6d40f2c100360df67983af57d877c13d967a0b47e40981a271e8", the same as the

transaction hash the VICTIM provided to the FBI, after making the test payment to SUBJECT on January 9, 2024.

23.     A review of the login records in the Coinbase return showed that the account was created on January 8, 2024, from an IP address that resolved to an AT&T cable/DSL connection based in Charlotte, North Carolina. The account was last accessed on January 14, 2024, from an IP address that also resolved to an AT&T cable/DSL connection based in Charlotte, North Carolina. Furthermore, between January 8, 2024 and January 10, 2024, the account was accessed using EXPRESSVPN, a virtual private network (VPN) service. Based upon my training and experience, I know that cyber actors often use VPNs to obscure their true IP address.

24.     An analysis of the metadata associated with the Coinbase login records show from January 8, 2024 to January 10, 2024, the Coinbase account was accessed multiple times via an Apple iPhone 15 device.

25.     On January 17, 2024 the investigative team obtained legal process on the SUBJECT EMAIL ACCOUNT from Microsoft.  The return for the email account contained 151 email messages, three text files, two Microsoft Excel spreadsheets, and one CSV file.

26.     Based on the information that Microsoft provided, the email account was created on December 11, 2023, at or around 8:45 PM Eastern Standard Time (EST). It was last accessed on January 17, 2024, at or around 10:10 AM EST, from an IP address that resolved to an AT&T cable/DSL connection based in Charlotte, North Carolina.

27.     On December 11, 2023, SUBJECT EMAIL ACCOUNT received an email message from EXPRESSVPN, info@info.expressvpn.com. The message included the following text:

"Hi Cameron,

Thanks for signing up! Now you can set up ExpressVPN on your computer, phone, tablet, and other devices to start enjoying online freedom

Your account details
PLAN
1 month

PRICE
12.95

PAYMENT METHOD
Credit Card

SUBSCRIPTION EXPIRES ON
12 Jan 2024"

28.     On December 11, 2023, the SUBJECT EMAIL ACCOUNT received an email message with the title "Hey" from "Cameron Curry" with the email address ccameron332@gmail.com.  The body of the email message included the text "Hey.".

29.     On December 17, 2023, the SUBJECT EMAIL ACCOUNT received an email message with the title "Microsoft account security info was added" from "Microsoft account team" with the email address "account-security-noreply@accountprotection.microsoft.com".  The message stated:

"Microsoft account
Security info was added

The following security info was recently added to the Microsoft account [SUBJECT EMAIL ACCOUNT]:
ccameron3321@gmail.com
If this was you, then you can safely ignore this email.

If this wasn't you, a malicious user has access to your account. Please review your recent activity and we'll help you secure your account."

Based on my knowledge, training and experience, your affiant believes that email messages like the one referenced here get automatically created when a user adds another email address as a recovery email address.  Therefore, your affiant believes that the SUBJECT added the email

account "ccameron3321@gmail.com" as a recovery email account for SUBJECT EMAIL ACCOUNT.

30.     On December 9, 2024, the SUBJECT EMAIL ACCOUNT replied to an email message that the VICTIM sent earlier on the same day. Based on the analysis of the contents of the message and timestamps, the exchange took place after the VICTIM made the aforementioned payment of about $2,500 USD to the SUBJECT. The email exchange was as follows:

**SUBJECT EMAIL ACCOUNT to VICTIM**:

"We have received payment thank you. We would like to ask what is your counter offer?"

**VICTIM to SUBJECT EMAIL ACCOUNT**:

"Loot –

The company is prepared to offer you $1.3 million in exchange for your providing proof of deletion and an explanation of how you came into possession of the data. Obtaining this large an amount of cryptocurrency will take some time, but we anticipate being able to make payment within 10 business days.

This offer is non-negotiable.  Please confirm if you agree and if so please provide the BTC address where you want payment to be sent.
 While payment is pending, it is imperative that you continue to show that you can be trusted.  If you send any further emails to the company's employees or leak any further data, the deal will be off the table.  Also, if you attempt to change the terms of the deal after we have an agreement, the deal will be off the table."

**SUBJECT EMAIL ACCOUNT TO VICTIM**:

"We agree and accept your offer. NO DATA WILL EVER BE RELEASED. Everything will be deleted with proof and explanation will be sent before payment is made.

Thank You!"

31.     On January 2, 2024, the VICTIM, via their legal counsel, indicated to the FBI that they believed CURRY, a former contract employee of the VICTIM, could be associated with the SUBJECT. The VICTIM provided information to the FBI explaining that on August 10, 2023, the

VICTIM retained CURRY as a contract Data Analyst through a recruitment consultancy (hereinafter "COMPANY-2"). He started work with the VICTIM on August 21, 2023. His contract was expected to last six months. As part of his official duties, CURRY had access to files that contained employee and payroll information, to include base pay, total target compensation, benefits, and performance analysis information for all 800+ VICTIM employees.

32.     On December 5, 2023, the VICTIM informed COMPANY-2 that CURRY's last day of employment would be December 15, 2023, before the end of the 6-month period. On December 6, 2023, a COMPANY-2 representative informed the VICTIM that CURRY was in Charlotte, North Carolina and that CURRY stated he was relocating there. COMPANY-2 representative confirmed that CURRY would mail back his laptop. On December 7, 2023, CURRY was reported missing from work. VICTIM decided to end CURRY's employment as of Friday, December 8, 2023.

33.     The VICTIM, through COMPANY-2, provided copies of email messages and other documents CURRY created during his employment. For example, on December 8, 2023, CURRY, using the email address "ccameron332@gmail.com", sent an email message to a COMPANY-2 representative and stated "*I am unable to access my VICTIM email but I work 40 hours the week ending in 12-10-2023. Thanks and have a greet weekend!*". Additionally, your affiant viewed a copy of CURRY's professional resume that the VICTIM provided to the FBI. The email address "ccameron332@gmail.com" and phone number "919-748-9707" were listed in the header section as contact information for CURRY. The email address on CURRY's resume is the same as the registrant contact information for the Coinbase 33Dh wallet account. The telephone number is the same as the verified number listed for the registrant of the 33Dh wallet account serviced by Coinbase. The Coinbase wallet used for a test ransom payment and CURRY all share the same

contact and registrant information. The recovery account added to the SUBJECT EMAIL ACCOUNT as a recovery address is the same as CURRY's resume contact information except the addition of the number "1" in the prefix.

34.     On January 23, 2024 the FBI obtained a search warrant issued by Magistrate Judge Carleton Metcalf in the Western District of North Carolina, for CURRY's apartment, vehicle, and person to search and seize digital devices containing evidence of CURRY's criminal conduct.

35.     On January 24, 2024, at or about 09:20 AM EST, Special Agents with the FBI arrived at the apartment building where CURRY's apartment was located. At or about 11:55 AM EST, Special Agents, while positioned in the parking lot adjacent to the building, spotted CURRY on to the balcony of his apartment. Agents asked CURRY to come down to have a conversation. CURRY asked the Agents "Me?", and one of the Agents replied "You". CURRY did not say anything else and walked back inside. At the time, Agents were wearing tactical gear with visible FBI placards on the front and back. After waiting a reasonable amount of time, Agents attempted to get in touch with CURRY on his cellular phone number via phone and text message. Agents informed CURRY via text that they had a search warrant. CURRY stated that "You can not come in here either." Following the text messages, FBI Agents called CURRY on his cellular phone. Agents told CURRY that they had a federal search warrant for his apartment and that he should come out of his apartment. CURRY declined to come out and stated that if they (the FBI Agents) had a search warrant, they (the FBI Agents) would have already come inside his apartment. CURRY added that he "was going to sleep" and hung up the phone.

36.     On January 24, 2024, at 12:25 PM EST, VICTIM's outside counsel stated to the FBI via email that the victim received following email messages from the SUBJECT EMAIL ACCOUNT:

**Wednesday, January 24, 2024 11:54 AM**: "If the police arrest me i will send this out"
**Wednesday, January 24, 2024 11:59 AM**: "If you send the police inside we have a schedule to send going out send them away"
**Wednesday, January 24, 2024 12:14 PM**: "If money is not in bitcoin within the next few we will be sending these slaries out to everyone."

The email messages sent from the SUBJECT EMAIL ACCOUNT to the VICTIM occurred within minutes of the FBI informing CURRY of the search warrant and requesting that CURRY exit his apartment to have a conversation with the Special Agents.

## TARGET ACCOUNTS

### *Apple*

37.    The investigative team reviewed the three text files Microsoft provided in the return for the SUBJECT EMAIL ACCOUNT. One of the text files contained metadata associated with a device running the operation system iOS 17.1. iOS is a mobile operating system that runs on Apple mobile devices, to include Apple iPhone and iPad. Technology providers, such as Microsoft, record device operating systems (OS) associated with accounts and services on their platforms. The text file in the return informs the team that the SUBJECT is using Apple devices with the identified OS.

38.    Furthermore, your affiant identified that some of the email messages sent from the SUBJECT EMAIL ACCOUNT included the text "Get Outlook for iOS" in the message body. Based on my knowledge, training and experience, your affiant knows that when an email message is sent using the Outlook mobile application, the application automatically places that text in the message body. Therefore, your affiant believes that the SUBJECT used the Outlook mobile application running on an Apple mobile device to send some of the messages.

39.     Analysis of the Coinbase return for the 33dH wallet account login information revealed the use of an iOS device as well. The return indicated that iPhone model was "iPhone16,2". Based on open-source information, "iPhone16,2" is the model ID for iPhone 15 Pro Max. The Coinbase return included other login information, but the device specific information could not be identified in the metadata. This leads investigators to believe there may be one or more devices in addition to the iPhone 15 being utilized on this account.

40.     On January 24, 2024 the FBI seized two Apple devices during execution of a search warrant on CURRY's apartment; an Apple iPhone 15 and Apple MacBook laptop. The Apple iPhone 15 was serviced by Verizon Wireless and utilized the assigned telephone number of 919-748-9707. The same number used to register the 33dH wallet account through Coinbase and listed on CURRY's resume provided to COMPANY-2 and the VICTIM. A preliminary review of CURRY's iPhone applications showed the Coinbase application present on the device.

41.     The Apple MacBook is undergoing forensic review, but early analysis indicates the data was deleted from the device. Your affiant knows that Apple offers the capability to sync devices' storage, browsing data, and other important information across devices in the cloud. The investigative team believes the contents of the TARGET ACCOUNT will not only provide additional evidence of the crimes under investigation, but also provide additional information about the deletion of the data from the MacBook seized during the search warrant.

## *Google*

42.     The Microsoft return from the SUBJECT EMAIL ACCOUNT included a message from Microsoft notifying the SUBJECT EMAIL ACCOUNT owner of a recovery email address added to the account. The recovery account added was ccameron3321@gmail.com. Your affiant

knows that cyber actors often add recovery accounts when managing multiple email accounts and other services and infrastructure.

43.     The 33dH wallet return from Coinbase included the registrant email address of ccameron332@gmail.com. The 33dH wallet received payments in Bitcoin from the VICTIM and was provided by the SUBJECT during negotiations for the stolen data.  The same email address is listed as contact information for CURRY on his professional resume. This information was provided to the FBI by COMPANY-2 and VICTIM during the initial investigation.

### *DropBox*

44.     The VICTIM retained outside counsel and a cybersecurity incident response firm during the first couple of weeks of the investigation. The incident response firm is completing an analysis the laptop issued to CURRY during his employment with VICTIM.

45.     Preliminary analysis of CURRY's company laptop shows him downloading a document named "2023MeritRollup_Merit&Bonus.xlsx" from the VICTIM's SharePoint cloud to his local machine. The data from this file was included in images or screenshots attached to the emails sent by the SUBJECT to the VICTIM.  The incident response firm believes this file was downloaded to stage for removal from CURRY's device.

46.     Further analysis of activities occurring on CURRY's company laptop show access to DropBox.com, a cloud services platform used for file storage and sharing.  The browser history on CURRY's laptop shows him accessing and authenticating an account on DropBox and uploading files to the platform.  Your affiant has reviewed the preliminary findings of the incident response firms analysis and agrees with the finding that CURRY uploaded some VICTIM files from his corporate laptop.  CURRY utilized his ccameron332@gmail.com email address for most of the services connected with the SUBJECT's activities.

47.     Based on all of the foregoing, as well as my training, education, and experience, I submit that there is probable cause to believe that CURRY is engaged in the TARGET OFFENSES—specifically, CURRY, using the SUBJECT EMAIL ACCOUNT, extorted the VICTIM, received a payment from the VICTIM via a cryptocurrency exchange, and continued attempts to engage in further extortion of the VICTIM.  Moreover, I submit that there is probable cause to believe that the TARGET ACCOUNTS will contain evidence of the criminal conduct CURRY is engaged in and that is referenced in this affidavit.

48.     A preservation letter was served under 18 U.S.C. § 2703(f) on the following provider(s):

| Date Served | Provider | Account(s) |
| --- | --- | --- |
| 01/23/2024 | Apple | 919-748-9707 |
| 01/25/2024 | Google | ccameron332@gmail.com, ccameron3321@gmail.com |
| 01/23/2024 | DropBox | ccameron332@gmail.com |

## TECHNICAL TERMS

49.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—

IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.  Virtual currency (also referred to as cryptocurrency) is a digital representation of value that can function as a medium of exchange, a unit of account, and/or a store of value.   Virtual currency is generally not issued by any government or bank.  It is generated and controlled through computer software operating on a decentralized, peer-to-peer network.

d.  Bitcoin Wallet: To send and receive Bitcoin, the parties involved in a transaction use Bitcoin "addresses."  A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  Most virtual currency exchanges act as a trading platform and storage platform. An exchange typically allows trading between the U.S. dollar, other fiat currencies, Bitcoin, and other virtual currencies.  Many virtual currency exchanges also store their customers' virtual currency in exchange-based "wallets" that are associated with each customer's account(s).  These exchanges act as money services businesses and are legally required to conduct due diligence of their customers and to have anti-money laundering checks in place.   Virtual currency exchanges doing business in the United States are regulated under the

Bank Secrecy Act, codified at 31 U.S.C. § 5311 et seq., and must collect identifying information of their customers and verify their clients' identities.

e. Know-Your-Customer (KYC): is a process of verifying a financial service company or institution's customer identities when opening an account and periodically thereafter.

f. Payment Hash: A transaction hash is a string of letters and numbers that is generated when a cryptocurrency transaction is initiated. It is a unique identifier that is used to track the transaction on the blockchain. Every transaction that occurs on the blockchain is recorded as a block, and each block has a unique hash.

g. Metadata: Data that provides informational or structural information about data. Also referred in some instances as properties.

## <u>BACKGROUND CONCERNING PROVIDER ACCOUNTS</u>

### <u>*Apple "Provider One"*</u>

50.    PROVIDER ONE is the provider of the internet-based account(s) identified by 919-748-9707.

51.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

52.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.      iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.      Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

53.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime)

only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

54.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

55.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

56.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.   In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

57.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple.  Records and data associated

with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

58.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

59.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

60.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

61.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.   In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

### *Google "Provider Two"*

62.     PROVIDER TWO is the provider of the internet-based account(s) identified by ccameron332@gmail.com and ccameron3321@gmail.com.

63.     Google[1] is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

64.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

65.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

66.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

67.     Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

68.     Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

69.     Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A

single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

70.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One.  In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

71.     Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on

Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

72.     My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts into automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

73.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual

will be saved in the user's Google Contacts. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

74.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

75.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

76.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

77.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, the TARGET ACCOUNT was utilized as a recovery account for the SUBJECT EMAIL ACCOUNT and primary contact information for the cryptocurrency wallet. Messages and other records will provide confirmation of CURRY's utilization of these and other accounts to support his criminal activities.

78.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.   Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

79.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information email and messaging logs, documents, and photos and videos may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to

access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

80.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

81.     Other information connected to the use of a Google account may lead to the discovery of additional evidence.  For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For example, the funds from the Coinbase account were moved to another linked account. Applications linked to CURRY's account may provide additional information about which financial institution or service the funds were moved to.  In addition, emails, Internet activity, documents, and contact and calendar information can lead to the identification of instrumentalities of the crimes under investigation.

### DropBox *"Provider Three"*

82.     PROVIDER THREE is the provider of the internet-based account(s) identified by ccameron332@gmail.com.

83.     Dropbox is a service that allows its users to store files on Dropbox's servers. According to Dropbox's privacy policy, at https://www.dropbox.com/privacy, Dropbox collects and stores "the files you upload, download, or access with the Dropbox Service," and also collects logs: "When you use the Service, we automatically record information from your Device, its software, and your activity using the Services. This may include the Device's Internet Protocol

("IP") address, browser type, the web page visited before you came to our website, information you search for on our website, locale preferences, identification numbers associated with your Devices, your mobile carrier, date and time stamps associated with transactions, system configuration information, metadata concerning your Files, and other interactions with the Service. "Dropbox is a free service that lets you bring all your photos, docs, and videos anywhere. This means that any file you save to your Dropbox will automatically save to all your computers, phones and even the Dropbox website."

84.    In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

85.    In this case, I seek this electronic information because the information connected to the use of the Providers' account(s) may lead to the discovery of additional evidence, including but not limited to: exfiltrated sensitive files from the VICTIM, linked accounts, stored communications, or other services used in furtherance of the crimes under investigation.

## CONCLUSION

86.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDERS, who will then compile the requested records at a time convenient to them, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____

Dereck Franklin
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 14, 2024

_____
**HONORABLE ZIA M. FARUQUI**
UNITED STATES MAGISTRATE JUDGE